JAMES HOLDER, ADMINISTRATOR. *v.* NORTH CAROLINA RAILROAD COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 16 October, 1912.)

**Railroads — Negligent Killing—Circumstantial Evidence—Presumptions—Nonsuit.**

Upon the trial of defendant railroad company for the negligent killing of plaintiff's intestate by a passing train, the plaintiff relied on circumstantial evidence tending to show that deceased, staggering and acting like a drunken man, about dark, was seen alive for the last time, going to defendant's track, where several trains passed during the night, and about 7 o'clock the following morning was found dead, in a sitting position on the end of a cross-tie, without sign that the body had been dragged or mangled, and without wounds, excepting two in the back of his head; that he could have been seen in time to have stopped the train. There was no evidence of failure to sound the whistle or ring the bell: *Held,* no presumption of the defendant's negligence arose from the killing of the deceased, if it was caused by defendant's train, but if in sitting position, that the engineer had a right to presume that he would get off the sill up to the last minute, and avoid the danger; and the burden of proof being on the plaintiff to show that the position of his intestate was such as to lead a man of ordinary prudence, in charge of the train, to believe he was unconscious and helpless, in the absence of evidence, a nonsuit was properly entered; and, *Held, further,* the fact that the intestate was found with his head resting on his arm between the cross-ties, lower than his body, was insufficient, as such posture would likely result if he had been hit by a passing train.

APPEAL by plaintiff from *Bragaw, J.,* at April Term, 1912, of WAKE.

This is an action to recover damages for the alleged negligent killing of the plaintiff's intestate.

The defendant denied that it killed the deceased, or that it was negligent, and pleaded contributory negligence.

There was no eye-witness to the killing, the plaintiff relying on circumstantial evidence.

The deceased was going from the railroad about sunset, and he was then staggering and acted like a drunken man. About dark he was going to the railroad, and this is the last time he was seen alive, as far as the evidence discloses. His body was found the next morning about 7 o'clock, in a sitting position on the end of a cross-tie, and while in that position several trains passed and did not touch him. There was no sign of the body being dragged or mangled, and there were no wounds except two in the back of his head. There was evidence that he could have been seen sitting on the cross-tie in time to stop the train.

There was no evidence of failure to sound the whistle or ring the bell.

The position of the body, and other circumstances, are described by a witness for the plaintiff as follows: "I went to the place where the man was found dead on the Southern Railroad track on 3 April, 1910. I was there early Sunday morning, somewhere around 7 o'clock. This spot is near my house. Back beyond where this man was found there was a curve in the track where it goes into a cut. That is coming back this way from where the man was found in the cut. In going from here to Clayton, he was found on the left-hand side of the track. There is a grade this way, but from where the engine emerges from the cut it is almost level. There is a public road that crosses the railroad. There is a public road that crosses the railroad a little beyond where the man was found. I think it was about 80 feet. The crossing was west from where he was found. I do not know the distance it is from the point where the man was found to the edge of the cut. I did not step it, because it had been surveyed by both parties. It was in my field where the body was found. There was no one there at all when I got there. I looked at the man and all around the track,

to see what I could learn. No one else was there until I left. I will describe to the jury how I found him, as best I can. You all know how cross-ties are. As well as I remember, the man was sitting with his left foot extended and right foot under him. He was in his shirt sleeves. He had his coat on his right arm, and part was across it, and the right arm was between the two cross-ties and his head was resting on right arm between the cross-ties and still his body was higher. He was sitting on the end of the cross-ties. I did not touch his body. I saw a wound on the back of his head that I judged was the cause of his death. I did not see any blood. I looked down the side of his face to see if I could see any blood, and there was very little. I saw no blood anywhere else. On that morning I went up about as far in the direction of Raleigh as that crossing, about 80 feet; only saw a little blood on his face. My recollection is not distinct as to how his coat was cut. I simply remember he was in his shirt sleeves and his coat was on his arm, and a part across the iron. The man's head was bending towards the east. I do not have any recollection of any train passing along there that night. Of course, I know when the regular trains pass, but on that particular night I did not pay any attention to it. I know along about that time, just a few days before and a few days after this man was found there, that the trains on the Southern Railway customarily passed that point at night. *I know the regular schedule immediately before and immediately after. The first train that would pass after sundown would be the midnight train that is due at Clayton at 12 o'clock,* which is the mixed train coming west. There is a freight train going east that passes that point about 10 o'clock. That would be the next train after sundown. There is a passenger train that leaves here about 7:30 that passes there about 8. I think at that time that it passed a little before dark. The schedule has been changed. After the midnight train, the next train would be the one that leaves here at 4:30 and passes there something after 5. The next one is the one that passes Clayton at 7:30 and that would bring you up to next morning. I was not present or hear the body when the west-bound passenger train comes along. I saw it after coroner

came and moved it. When I first went up there, of course I had curiosity to see what killed the man, but the wound on the back of the head seemed a little indistinct. I did not look at it very closely. Did not examine it when I went back. When I saw the body the second time, they had taken it off the track and were preparing to move it away. I did not look for any blood at that time."

At the conclusion of the evidence, judgment of nonsuit was entered, and the plaintiff excepted and appealed.

*Douglass, Lyon & Douglass and R. N. Simms for plaintiff. W. B. Snow for defendant.*

ALLEN, J. The evidence in *Clegg v. R. R.*, 132 N. C., 293, in which a judgment of nonsuit was sustained, was "that plaintiff's intestate was seen going in the direction of defendant's track and was later found dead, lying by the side of the track where a dirt road ran parallel with it, but not at a crossing, and with bruises from which it might be reasonably inferred that he had been knocked off the track and killed by defendant's engine. The track was straight at that point for half a mile, possibly more. Part of the back of intestate's head was knocked off. There was no eye-witness to the death, whether he was killed by the engine, or, if so, whether he was on the track or close by it when struck, or whether he was walking or sitting down or lying down on the track. There was no sign of the intestate having been dragged, nor had he been run over by the engine. The killing was at night. There was evidence by plaintiff's witnesses that there was no sign of blood on the cross-ties, and some evidence to the contrary"; and the Court, speaking through the present *Chief Justice,* said: "If the deceased was either walking or sitting or lying down on the track, this was evidence of contributory negligence. *Hord v. R. R.,* 129 N. C., 305. If walking or sitting down, the engineer (nothing else appearing) had a right to presume he would get off before the train struck him, and there would have been no negligence on the part of the defendant inferable from the mere fact, without further evidence, that the deceased was killed while on the track, for the engine had the right of way. If deceased had

been helpless, lying down on the track, and the engineer with
proper outlook could have seen him in time to avoid killing
him, and did not do so, this would have been negligence render-
ing the defendant liable, notwithstanding the previous contrib-
utory negligence of deceased, and that the track was straight
for half a mile or more was evidence to go to the jury that if he
had been lying down the engineer, with proper outlook, could
have seen him; but there was no evidence tending to show that
he was lying down (*McArver v. R. R.,* 129 N. C., 380), and the
burden of showing that the deceased was helpless on the track
was upon the plaintiff. *Hord v. R. R.,* 129 N. C., 305. The
evidence of some blood on the track (though contradicted by
plaintiff's other witnesses) was equally consonant with deceased
having been struck while walking or sitting down."

The evidence in this case is much more favorable to the
defendant than was the evidence in the case cited, because here
the plaintiff has shown that his intestate was sitting on the
end of the cross-tie at the time he was struck by the train of
the defendant, if it struck him, and is in all material aspects
like that in *Upton v. R. R.,* 128 N. C., 173.

As no presumption of negligence arises from the killing of
the deceased, and as the engineer had the right to presume,
up to the last moment, he would get off the cross-tie, if he was
sitting up, the burden was on the plaintiff to prove that his
appearance while on the cross-tie was such as to lead a man of
ordinary prudence, in charge of the train, to believe he was
unconscious or helpless, and we find nothing in the evidence
that amounts to more than conjecture or speculation as to this
fact.

The circumstance that the head was bent over *at the time
the body was found,* chiefly relied on by the plaintiff, is explained
by the strong probability that a blow causing death could not
have been received without making some change in the posi-
tion of the body, and when death ensued it was natural for the
head to drop.

It also appears that several trains passed the body while on
the cross-tie, without touching it, which would indicate a change
in the position of the body after it was struck, if the deceased
was killed by a train of the defendant.

We are, therefore, of opinion that the evidence is not of such character as to justify submitting it to the jury.

There is a marked distinction between this case and that of *Henderson v. R. R.*, 159 N. C., 581.

In the *Henderson case* the killing was admitted, and it was in the daytime. There was evidence that no whistle was sounded; that the deceased was found asleep by the side of the track about two hours before his death; that when aroused he walked up the track in the direction his body was afterwards found, staggering; that when found the body was on one side of the track, the head on the other, one arm under the trestle, and the other badly mangled; that there was blood on the rail; and none of these circumstances appear in this case.

The ruling on the admission of a part of the answer is immaterial, as it has no tendency to prove that the deceased was in an apparently helpless condition, but simply that he was sitting on the end of a cross-tie.

Affirmed.